2005-NMSC-034

120 P.3d 836

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Jaclyn DURAN, Defendant–Respondent.**

**No. 28,241.**

Supreme Court of New Mexico.

Aug. 31, 2005.

Patricia A. Madrid, Attorney General, Patricia A. Gandert, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Lilley Law Offices, Michael W. Lilley, Lawrence W. Allred, Las Cruces, NM, for Respondent.

## OPINION

MAES, Justice.

{1} This case requires us to determine whether a police officer's questioning of a stopped motorist about her travel plans exceeded the permissible scope of a search or seizure under the Fourth Amendment. We find that the questions the police officer asked the driver of the stopped car were permissible because they were reasonably related to the purpose of the stop. Because the questions were permissible, the answers to them can be considered in determining if, under the totality of the circumstances, the officer had reasonable suspicion to expand the scope of the search or seizure beyond the initial justification for the stop. We hold that the officer did have reasonable suspicion to expand the scope of his search or seizure. Thus, the motorist's subsequent consent to allow the officer to search her car was not tainted by a prior illegal search or seizure. In so holding, we affirm the trial court's denial of Defendant's Motion to Suppress and reverse the Court of Appeals.

### FACTS AND PROCEDURE BELOW

{2} Defendant does not challenge the facts as found by the trial court. Defendant and her passenger, Kate Williams, were traveling

east on New Mexico State Road 26, northeast of Deming, New Mexico, on a cold winter afternoon. State Road 26 is a fifty-mile direct route from Deming to Hatch, New Mexico. It is a two-lane road which permits motorists to drive directly from Interstate 10 to Interstate 25, without having to go through Las Cruces, New Mexico. Where State Road 26 connects to I–25, drivers can either head north to Albuquerque or south to Las Cruces. Where State Road 26 connects to I–10, drivers can either head west to Tucson, Arizona or east to Las Cruces.

{3} State Police Officer Johnston was patrolling State Road 26 when he noticed that Defendant's white Chevrolet Camaro hatchback did not have a license plate. He therefore began following Defendant. Once Officer Johnston neared Defendant's vehicle he could see a white piece of paper in the rear window that he assumed was a temporary registration tag; however, it was placed so high up in the window he could not make out the expiration date. Officer Johnston initiated a traffic stop to ensure the tag was not expired and to issue a citation for not having the tag properly placed in the window.

{4} Once both vehicles were pulled over on the side of the road, Officer Johnston turned on the in-car camera and a microphone on his person so that the entire stop was recorded. When he came to the passenger side window he informed Defendant and Williams of the reasons for the stop. He then asked Defendant and Williams for their driver's licenses, registration and insurance. During this time, Officer Johnston noticed several items in the car: a two-ton floor jack, some loose tools, an overnight bag, a cellular phone plugged into the dash, and the odor of raw gasoline.

{5} Defendant produced her driver's license and had the bill of sale for the car in her pocket, but did not have proof of insurance. Officer Johnston asked Defendant to step out of the car, and to follow him to the patrol car to wait while he ran a wants and warrants check and issued citations for improperly displaying a temporary tag and not having proof of insurance. Officer Johnston also testified that he brought Defendant back to his patrol car to complete the tasks required by the stop because there was no room between the driver's side of the car and the road, and this made him concerned for both his and Defendant's safety. He also testified that separating a driver and a passenger takes the driver out of his or her safety zone. Further, Officer Johnston testified that on this particular day he had to return to his patrol car to change radio channels because there was a hazardous materials spill on a highway near Lordsburg, New Mexico that tied up the radio.

{6} On the way back to the patrol car, Officer Johnston showed Defendant how the tag was improperly displayed. Officer Johnston checked that the dates and numbers on the temporary tag and the bill of sale matched up, which they did.

{7} Once back at the patrol car, Officer Johnston first noticed that Defendant had very little paperwork surrounding the sale of the car. He testified that in his experience most people have more paperwork surrounding the purchase of a vehicle with them when they have not yet completed registering the vehicle, such as invoices, warranties, and included options like new tires, etc. Officer Johnston also testified that the bill of sale contained irregularities and omissions that suggested that, even though the bill of sale listed a dealership as the seller of the car, it probably was not sold at a dealership. The irregularities included: a handwritten bill of sale, which he testified increases the possibility of forgery; someone signed the odometer disclosure statement to certify that the odometer currently read a certain mileage, but failed to include the particular mileage reading; there were several boxes in the odometer disclosure statement that should have been checked but were not; and the vehicle was purchased less than a month earlier but the temporary tag was set to expire in five days, which was a short amount of time.

{8} Officer Johnston then engaged Defendant in what the State characterizes as "casual conversation" as he ran a warrant check on both Defendant and Williams and reviewed their driver's licenses and the bill of sale. He asked Defendant where she was going and where she came from. Defendant

answered that she and Williams were on their way to Las Cruces from Silver City, New Mexico. Because taking State Road 26 is an indirect route from Silver City to Las Cruces, to clarify Officer Johnston again asked where Defendant was coming from and where she was going. Defendant repeated her story that she and Williams were headed from Silver City to Las Cruces. Officer Johnston then asked why she was taking such an indirect route. Defendant told him that she and Williams had never taken this route before and wanted to see how long it would take them to complete the trip, that they were just out for a drive. Officer Johnston testified that Defendant's hesitance and nervous behavior indicated to him that she was making up the story as she went along.

{9} Officer Johnston next went back to Defendant's car to check the vehicle identification number (VIN) and match it to the temporary tag and bill of sale. While walking back to the patrol car, Officer Johnston asked Williams about her and Defendant's itinerary. Williams answered that she and Defendant were coming from Las Cruces and going to Albuquerque. Officer Johnston asked her if she had been anywhere else that day, and Williams replied, "no." Officer Johnston then asked Williams to identify more specifically who she was going to visit in Albuquerque. Williams replied that she was going to visit "Derrick" and "Jesse," who lived on San Mateo Boulevard. Officer Johnston asked Williams if Defendant knew Derrick and Jesse, and Williams hesitantly replied that she did not know and did not know who Defendant was planning on visiting. These questions to Williams lasted only a few brief moments.

{10} Back at the patrol car, Officer Johnston wrote out the citations for the improperly displayed registration tag and failure to maintain and carry proof of insurance. While doing these tasks, Officer Johnston again asked Defendant where she was going and where she came from. Defendant again answered that she was coming from Silver City on her way to Las Cruces, but this time added that she had been visiting relatives in Silver City. Officer Johnston asked where her relatives lived, but Defendant could not remember her relatives' address.

{11} Officer Johnston proceeded to ask Defendant questions about the bill of sale for the vehicle. He asked Defendant if there had been a co-signer on the bill of sale. She answered yes, that her Uncle Roman had co-signed with her. Officer Johnston pointed out that the name on the bill of sale was "Ramon." Defendant said that she knew, but that she called her uncle "Roman" instead of "Ramon."

{12} Officer Johnston then asked Defendant how much she paid for the car and what year it was. Defendant hesitated but answered that the car was a 1987 model and that she paid $5,500 for it. Defendant told Officer Johnston that she had recently graduated from high school and was presently unemployed, but was employed not too long ago. Officer Johnston thought that the price paid for the car was excessive based on the dilapidated condition of the car, and wondered how she could have paid so much when she was presently unemployed. When questioned, Defendant did not know the specific date when she purchased the vehicle. In general, Officer Johnston testified that Defendant's answers were hesitant and belied a lack of understanding about the basic facts of the vehicle and its purchase. During this time, Officer Johnston noticed that Defendant was getting nervous and jittery, more so than a normal person is during a traffic stop. She would turn away from Officer Johnston and repeatedly looked back nervously. Her hands were shaking and she repeatedly put them in front of her face. This nervous behavior raised Officer Johnston's curiosity.

{13} Next, Officer Johnston went back to the vehicle to return Williams' license. He again questioned her about her destination. She again answered that they were on their way from Las Cruces to Albuquerque and denied being anywhere else that day.

{14} Officer Johnston then went back to the patrol car and handed Defendant her driver's license, bill of sale and the completed citations. At that point, Officer Johnston stated that he was done with the citation, but indicated he had a few more questions for Defendant, "if she didn't mind." Defendant

indicated she did not mind. Officer Johnston again asked Defendant about her trip itinerary. Defendant again answered that she and Williams had spent the night in Silver City with her aunt and were headed to Las Cruces. Although she could not remember her aunt's address, she said it was near a high school.

{15} At this point, seventeen minutes had elapsed since Officer Johnston initiated the stop to issue a citation for the improperly displayed temporary registration tag. Officer Johnston then asked Defendant if she had any drugs or large amounts of cash in the car, and Defendant answered, "no." Officer Johnston asked both Defendant and Williams for consent to search the vehicle. Both gave verbal consent. Officer Johnston also had them sign a written consent to search form.

{16} Immediately upon receiving consent to search, Officer Johnston looked under the rear of Defendant's car and noticed irregularities in the gas tank area. A Border Patrol agent arrived on the scene shortly, and performed a canine search of Defendant's vehicle. Officer Johnston and the Border Patrol agent placed a fiber optic scope into the gas tank of Defendant's vehicle. Through this device, they were able to observe plastic bags in the gas tank. Based on Officer Johnston's training and expertise, he suspected the material was narcotics. Defendant and Williams were arrested. Thirteen plastic vacuum-sealed bags of marijuana were eventually seized from the gas tank.

{17} Defendant was originally charged with possession of marijuana with intent to distribute and conspiracy. Defendant was subsequently charged with an additional two counts of falsifying title documents. Defendant filed a motion to suppress the marijuana, and the State filed a motion in opposition. After an evidentiary hearing on the motion, the trial court denied Defendant's motion to suppress and entered extensive findings of fact and conclusions of law. At the hearing, Officer Johnston testified that State Road 26 is commonly used by drug traffickers to bypass the twenty-four hour border patrol check points along Interstate 25. He testi-

fied that he had sat in on interviews with convicted drug traffickers who stated that they cross the international border at Columbus, New Mexico and take State Road 26 from Deming until it connects with other little used state roads to travel to Albuquerque and then points beyond inside the United States. Defendant then entered a conditional guilty plea, reserving the right to appeal the following issues: (1) the validity of the stop; (2) the scope of Officer Johnston's questioning during the investigatory stop; and (3) the tainting of Defendant's consent to the search because of the unreasonably prolonged stop.

{18} The Court of Appeals reversed the trial court, holding that Officer Johnston impermissibly expanded the scope of the search by asking Defendant questions about her travel plans. *State v. Duran*, 2003–NMCA–112, ¶ 21, 134 N.M. 367, 76 P.3d 1124. The court held that asking about travel plans was not reasonably related to the circumstances that initially justified the stop, i.e. the misplaced or concealed temporary tag. *Id.* ¶¶ 20–21. The court further held that Officer Johnston did not sufficiently explain how his training as a police officer made the facts he observed prior to asking the travel questions rise to the level of reasonable suspicion, *id.* ¶ 20, and, therefore, Defendant's subsequent consent was the fruit of the illegal search and the evidence seized must be excluded, *id.* ¶ 22.

## STANDARD OF REVIEW

{19} Whether a search and seizure was constitutional is a mixed question of law and fact. *See State v. Vandenberg*, 2003–NMSC–030, ¶ 17, 134 N.M. 566, 81 P.3d 19. We review factual determinations by the trial court under a substantial evidence standard. *Id.* We review the lower court's determination of legal questions de novo. *Id.* This includes our review of whether Officer Johnston's actions were objectively reasonable and comported with the constitutional restraints on police action. "We conduct this review de novo along with our review of any inferences the district court may have drawn from its factual findings." *Id.* ¶ 19. In reviewing a motion to suppress, we look to:

whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party; all reasonable inferences in support of the court's decision will be indulged in, and all inferences or evidence to the contrary will be disregarded. Resolution of factual conflicts, credibility and weight of evidence is particularly a matter within the province of the trier of fact. A reviewing court is not, however, bound by a trial court's ruling when predicated upon a mistake of law. *State v. Werner*, 117 N.M. 315, 317, 871 P.2d 971, 973 (1994) (*quoting State v. Boeglin*, 100 N.M. 127, 132, 666 P.2d 1274, 1279 (Ct.App.), *rev'd on other grounds*, 100 N.M. 470, 672 P.2d 643 (1983)) (citations omitted in original).

## DISCUSSION

{20} Because the facts in this case are undisputed, we proceed to determine whether the trial court correctly applied the law to those facts.

{21} The State asks this Court to overrule the Court of Appeals' determination that Officer Johnston "unduly expanded the scope of his investigation when he interrogated Defendant and Williams about their itinerary." *Duran*, 2003–NMCA–112, ¶ 18, 134 N.M. 367, 76 P.3d 1124. The State argues that the court was wrong to characterize Officer Johnston's dealings with Defendant and Williams as "interrogation." Rather, the State argues the questions Officer Johnston asked Defendant and Williams about their itinerary should be characterized as "casual conversation," and that, in general, "questions regarding travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop." Armed with the inconsistent and strange travel plans of Defendant and Williams, along with Defendant's nervousness, the irregularities in the bill of sale, the smell of raw gasoline and the items he observed in the car, the State argues that Officer Johnston was justified in expanding the scope of his search to ask about the presence of drugs or large amounts of currency in the car. And thus, Defendant's subsequent consent to Officer Johnston's search of the car was valid and the evidence should have been admitted.

{22} In order to place the State's arguments in perspective, it is helpful to begin by outlining the relevant constitutional framework. Defendant did not address how the New Mexico Constitution may afford her greater protection than the federal Constitution, and thus we only address the issue under general Fourth Amendment law. *See State v. Gomez*, 1997–NMSC–006, ¶¶ 22–23, 122 N.M. 777, 932 P.2d 1. The Fourth Amendment prohibits the government from subjecting individuals to "unreasonable searches and seizures." U.S. Const. amend. IV. An automobile stop and the attendant detention of its occupants is a " 'seizure' " under the Fourth and Fourteenth Amendments. *Werner*, 117 N.M. at 317, 871 P.2d at 973 (quoting *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Traffic stops must, therefore, be conducted in a reasonable manner to satisfy the Fourth Amendment. Whether a traffic stop is conducted in a reasonable manner is determined by balancing the public interest in the enforcement of traffic laws against an individual's right to liberty, privacy, and freedom from arbitrary police interference. *See Pennsylvania v. Mimms*, 434 U.S. 106, 107–12, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam).

{23} New Mexico and many other courts analyze the reasonableness of a traffic stop in accordance with the two-part test in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. *See Werner*, 117 N.M. at 317, 871 P.2d at 973; *see also Mimms*, 434 U.S. at 107–12, 98 S.Ct. 330; *United States v. Holt*, 264 F.3d 1215 (10th Cir.2001) (en banc). *See generally* Thomas Fusco, Annotation, *Permissibility Under Fourth Amendment of Detention of Motorist by Police, Following Lawful Stop for Traffic Offense, to Investigate Matters Not Related to Offense*, 118 A.L.R. Fed. 567, 1994 WL 906418, § 2 (1994). *Terry* provides a useful way to analyze traffic stops by breaking them down into two parts: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."

392 U.S. at 20, 88 S.Ct. 1868. We previously recognized the second part of the *Terry* test in *Werner,* where we said "[a]n officer who makes a valid investigatory stop may briefly detain those he suspects of criminal activity to verify or quell that suspicion," but that the officer's actions during the "investigatory detention must be reasonably related to the circumstances that initially justified the stop." *Werner,* 117 N.M. at 317, 871 P.2d at 973. An officer may expand the scope of the search or seizure during the investigatory stop "only where the officer has reasonable and articulable suspicion that other criminal activity has been or may be afoot." *State v. Taylor,* 1999–NMCA–022, ¶ 20, 126 N.M. 569, 973 P.2d 246. "Reasonable suspicion must be based on specific articulable facts and the rational inferences that may be drawn from those facts." *State v. Flores,* 1996–NMCA–059, ¶ 7, 122 N.M. 84, 920 P.2d 1038. "In determining whether reasonable suspicion exists, we examine the totality of the circumstances." *State v. Cardenas–Alvarez,* 2001–NMSC–017, ¶ 21, 130 N.M. 386, 25 P.3d 225. This is a fact-specific inquiry that does not lend itself to bright-line rules. *See Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (noting that Supreme Court has "consistently eschewed bright-line rules [in the Fourth Amendment context], instead emphasizing the fact-specific nature of the reasonableness inquiry.").

{24} Defendant does not challenge that Officer Johnston was justified in making the initial stop, or his authority to ask for her driver's license, registration and proof of insurance, and run a wants and warrants check to ensure all the documents were still current. *Vandenberg,* 2003–NMSC–030, ¶ 21, 134 N.M. 566, 81 P.3d 19 (noting that suspicion of violating a traffic code supplies the initial justification for stopping a vehicle); *State v. Reynolds,* 119 N.M. 383, 388, 890 P.2d 1315, 1320 (1995) (holding that after a valid investigatory stop an officer is entitled to verify that "the driver is both licensed and driving a car that is registered and insured");

*Holt,* 264 F.3d at 1221 (running outstanding warrants and criminal background checks during a routine traffic stop are reasonable measures designed to protect officer safety). Nor does Defendant challenge the fact that she did not have valid proof of insurance under NMSA 1978, § 66–5–205(B) (1998). Thus, the first part of the *Terry* test is not at issue because there was a valid justification for the initial stop.

{25} Placed within the *Terry* framework, the State argues that Officer Johnston's questions about travel plans were reasonably related to the initial justification for the stop, thus eliminating the need to analyze the second part of the *Terry* test. Conversely, Defendant argues, and the Court of Appeals in this case agreed, that Officer Johnston's questions about travel plans were not reasonably related to the initial justification for the stop and that he violated the second part of the *Terry* test by impermissibly expanding the scope of his questioning beyond the initial justification for the stop when he asked Defendant about her travel plans.[1] *See Duran,* 2003–NMCA–112, ¶¶ 18, 21, 134 N.M. 367, 76 P.3d 1124.

{26} New Mexico case law has not dealt with the specific question of whether a police officer impermissibly expands the scope of the search or seizure beyond the justification for the initial stop by inquiring into a motorist's travel plans or whether such questions are reasonably related to the initial justification for a traffic stop. Many other courts have considered this issue, and the majority hold that an officer may permissibly inquire about a motorist's travel plans without violating the Fourth Amendment. *See Holt,* 264 F.3d at 1221 (observing that inquiries about travel plans are generally permissible as relating to purpose of traffic stop); *United States v. Murillo,* 255 F.3d 1169, 1174 (9th Cir.2001) (noting that the officer had reasonable suspicion to expand scope of his questioning at a traffic stop because of the answers the defendant provided during routine

---

**1.** In challenging her convictions before the Court of Appeals and this Court, Defendant does not appear to make much of a point with respect to the police officer intentionally separating the driver from the passenger and then questioning them independently. Therefore, we express no opinion as to the constitutional significance, if any, of that fact under either the New Mexico or United States Constitutions.

questioning, including his "inability to explain his travel plans"); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994) (noting that "[t]ypically, a reasonable investigation of a traffic stop may include . . . asking the driver about his destination and purpose."). How those courts reach that conclusion, however, is not consistent. *See United States v. Garrido–Santana*, 360 F.3d 565, 574 (6th Cir. 2004). *See generally* Bill Lawrence, Note, *The Scope of Police Questioning During a Routine Traffic Stop: Do Questions Outside the Scope of the Original Justification for the Stop Create Impermissible Seizures if They Do Not Prolong the Stop?*, 30 Fordham Urb. L.J.1919, 1926–27 (2003) (noting a split between the Fifth and Seventh Circuits and the Eighth, Ninth, and Tenth Circuits). Nonetheless, there is a definite consensus that inquiries into a motorist's travel plans are permissible because they are either reasonably related to the initial justification of the traffic stop or are simply a part of the routine questions that officers are permitted to ask stopped motorists. We will discuss how the different jurisdictions come to this conclusion.

{27} The State points to the United States Tenth Circuit Court of Appeals en banc opinion in *Holt* as containing the proper analysis for this issue. In *Holt*, a plurality of the court affirmed the use of the two-part *Terry* test to evaluate traffic stops. 264 F.3d at 1220. The plurality then stated that "it is beyond dispute that an officer may ask questions relating to the reason for the stop. Ordinarily, this also includes questions relating to the motorist's travel plans." *Id.* at 1221. In *Holt* and other decisions, the Tenth Circuit has avoided creating a bright-line test for analyzing what questions a police officer can ask a validly stopped motorist. *Id.* at 1220 (citing *Robinette*, 519 U.S. at 39, 117 S.Ct. 417). Rather, the court has analyzed each kind of question an officer may ask by balancing "the public interest" of law enforcement with "the individual's right to personal security free from arbitrary interference by law officers." *Id.; see also United States v. Oliver*, 363 F.3d 1061 (10th Cir. 2004). Further, in *Holt*, the court cautioned that in every case the reasonableness of a traffic stop "must be judged by examining both the length of the detention and the manner in which it is carried out." *Id.* at 1230.

{28} The plurality in *Holt* gave two reasons why inquiries into a motorist's travel plans were usually reasonably related to the initial justification for the traffic stop. First, it noted that questions about a motorist's travel plans are generally permissible because they are usually related to the purpose of the stop and further valid governmental law enforcement interests. *See id.*, 264 F.3d at 1221. The answer may give context to the motorist's behavior that necessitated the stop in the first place. A motorist's long trip may be the reason why he or she is tired and explain why he or she swerved across the center-line, or a particular urgency may explain speeding. *See id.*

{29} Second, questions about travel plans are usually reasonable under the Fourth Amendment because the intrusion to the public is normally minimal. *Id.* Because these questions are asked while the officer is completing the tasks related to the traffic violation, they should result in a minimal delay to the motorist. *See United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997) (holding that questions about travel plans were permissible because they were completed within the time necessary to run the warrants check).

{30} The Tenth Circuit's case-by-case analysis to determine what questions are permissible during a traffic stop is also used by the Ninth and Eighth Circuits. *See, e.g., Murillo*, 255 F.3d at 1174 (holding that an officer must "articulate suspicious factors that are particularized and objective" in order to expand questioning beyond his or her justification for the initiation of contact); *Ramos*, 42 F.3d at 1163 (noting that a police officer must have suspicions raised by answers to routine questions in order to ask questions not reasonably related to the initial purpose of the stop).

{31} We recognize that the Seventh and Fifth Circuits analyze permissible questions by police officers at valid traffic stops differently from the Tenth, Ninth and Eighth Circuits. *See Lawrence, supra*, at 1920. The

Seventh and Fifth Circuits have created a bright-line test to determine what questions an officer may ask during a valid traffic stop. Under that bright-line test, an officer may ask a question outside the scope of the initial justification for the stop so long as it does not further lengthen the time taken to process the initial justification for the stop. In other words, if the questions asked do not lengthen the stop, the questions are valid. This reasoning is explained in both *United States v. Childs*, 277 F.3d 947 (7th Cir.2002) (en banc), and *United States v. Shabazz*, 993 F.2d 431, 436–37 (5th Cir.1993). In both cases, the courts held that questions by police officers during a traffic stop are not seizures or searches proscribed by the Fourth Amendment, and cited United States Supreme Court cases dealing with non-custodial police-citizen encounters for support. *See, e.g., Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (holding that police may approach persons and ask questions or permission to search, so long as police do not imply that answers or consent are required); *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[M]ere police questioning does not constitute a seizure.").

{32} We also note that state courts are split along the same lines as the federal circuits. For example, Georgia, New Jersey and Wisconsin examine whether questions about travel plans are permissible on a case-by-case basis and require such questions to be reasonably related to the initial justification for the stop. *See Pitts v. State*, 221 Ga.App. 309, 471 S.E.2d 270 (1996); *State v. Chapman*, 332 N.J.Super. 452, 753 A.2d 1179 (2000); *State v. Malone*, 274 Wis.2d 540, 683 N.W.2d 1 (2004). Arkansas, Delaware, Michigan, Nebraska, North Dakota and Oklahoma reason that questions about travel plans are part of the routine questions that police officers may always ask stopped motorists as long as the questions do not lengthen the time of the stop. *See People v. Williams*, 472 Mich. 308, 696 N.W.2d 636 (2005); *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003); *State v. Fields*, 662 N.W.2d 242 (N.D.2003); *Laime v. State*, 347 Ark. 142, 60 S.W.3d 464 (2001); *Caldwell v. State*, 780 A.2d 1037 (Del. 2001); *State v. Paul*, 62 P.3d 389 (Okla.Crim.

App.2003). Many of these states simply cited a case from the federal circuit that covers the state to support their approach to this issue.

{33} We disagree with the reasoning of the Seventh and Fifth Circuits and the state courts that follow them because it ignores the scope requirement of the second-prong of the *Terry* test, which our case law has consistently recognized as appropriate to analyze traffic stops. As we said in *Werner*, an officer's actions during the "investigatory detention must be reasonably related to the circumstances that initially justified the stop." 117 N.M. at 317, 871 P.2d at 973; *see, e.g., Taylor*, 1999–NMCA–022, ¶ 20, 126 N.M. 569, 973 P.2d 246 (holding that any questions an officer asks of a stopped motorist must be "reasonably related to the circumstances which justified his initial stop"). We feel the cases relied upon by the Seventh and Fifth Circuits that deal with non-custodial police-citizen interaction are inapplicable to traffic stop encounters. Once a motorist is stopped, he or she is seized under the Fourth Amendment because his or her freedom is curtailed by official police action. *See Berkemer v. McCarty*, 468 U.S. 420, 436–38, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Traffic stops are therefore not completely non-custodial and must be analyzed according to the *Terry* two-prong test.

{34} We believe that our precedent is more in line with that of the Tenth, Ninth and Eighth Circuits and Georgia, New Jersey and Wisconsin. Our case law has consistently disfavored a bright-line test in analyzing Fourth Amendment questions. *See Werner*, 117 N.M. at 317–18, 871 P.2d at 973–74. We have continually used a fact-based, case-by-case approach to determine what questions are reasonably related to the initial justification for the stop and whether an officer had reasonable suspicion to expand the scope of his or her search or seizure during an investigatory stop. *See, e.g., Reynolds*, 119 N.M. at 386, 890 P.2d at 1318 (stating that in Fourth Amendment search and seizure cases "we determine whether there is a valid government interest [in performing the search]; if so, we balance that interest against the degree and nature of the

intrusion of [the defendant's] personal security").

{35} Thus, we affirm that all questions asked by police officers during a traffic stop must be analyzed to ensure they are reasonably related to the initial justification for the stop or are supported by reasonable suspicion. We believe that this determination must also include an examination of "both the length of the detention and the manner in which it is carried out." *Holt*, 264 F.3d at 1230. The length of the detention should be reasonably limited to the time it takes to complete the underlying justification for the stop. Further, the scope of the questioning should be limited, as well. *See id.* The particular facts of each stop and the intrusiveness of the questioning will dictate what questions are reasonable or unreasonable. *See United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("[W]e consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant."); *see also Pitts v. State*, 221 Ga.App. 309, 471 S.E.2d 270, 272 (1996) ("The deputy merely asked these suspects about their travel itinerary in a manner which was not extensive or prolonged, and was not unconstitutionally intrusive...."). So called, "casual conversation" is not such a reasonable justification.

{36} We also recognize that certain responses to routine questions and requests by a police officer may elicit a strange or suspicious response by a stopped motorist. "The determination whether a traffic stop is reasonable must necessarily take into account the evolving circumstances with which the officer is faced." *Williams*, 696 N.W.2d at 641. The police officer may ask follow up questions that will quickly confirm or dispel any suspicion brought on by those answers. *See Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138 ("[T]he officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions."). These follow-up questions are subject to the reasonableness standard and must intrude on a person's liberty as little as possible under the circumstances. However, police officers may not badger motorists and their passengers hoping to create inconsistencies.

{37} Here, the initial justification for the traffic stop was a misplaced temporary registration tag. Officer Johnston knew the stop was on a drug-courier route. As he approached the vehicle, Officer Johnston observed the strange and suspicious tools in the back of the car and smelled the raw odor of gasoline. Defendant presented an irregular bill of sale without normal paperwork. These strange or suspicious circumstances surrounding the initial justification for the traffic stop, while not rising to the level of reasonable suspicion of other criminal activity, permitted Officer Johnston to ask limited questions about travel plans and permit us to conclude that those questions were reasonably related to the scope of the initial stop. Further, he asked the questions to Defendant while he was waiting for the wants and warrants check to come back from dispatch. Similarly, he asked Williams about travel plans while he was checking the VIN number on the car. In both instances the questions were asked while Officer Johnston completed the tasks necessary to process the traffic stop and they resulted in no additional delay, or only a *de minimis* additional delay, to both Defendant and Williams. We note that Officer Johnston asked minimally intrusive questions to confirm or dispel his initial suspicion after Defendant told him of the circuitous route she was driving. Defendant's answers only increased Officer Johnston's suspicions. Only after Defendant described a strange and circuitous route in response to Officer Johnston's initial question, and Williams' and Defendant's stories conflicted, did Officer Johnston ask detailed questions. Therefore, the questions were reasonable because the government's strong interest in asking the questions outweighed the limited intrusion into Defendant's privacy.

{38} Because Officer Johnston's questions about travel plans were reasonably related to the scope of the justification for the initial stop, we must now determine if Officer Johnston had reasonable suspicion of

other criminal activity to expand the scope of his search and seizure of Defendant when he asked about drugs and large amounts of currency and requested consent to search the vehicle. "The determination of whether reasonable suspicion justifies a detention depends both on the probativeness of the articulable suspicious circumstances and the extent of the intrusion." *State v. Guzman*, 118 N.M. 113, 115–16, 879 P.2d 114, 116–17 (Ct. App.1994). Officer Johnston testified that State Road 26 is commonly used by drug traffickers to by-pass the twenty-four hour border patrol check points along Interstate 25. He observed the tools, overnight bag, and cell phone, and smelled the raw odor of gasoline. He noted the general lack of paperwork surrounding the vehicle and specifically that the bill of sale was filled out incompletely and incorrectly even though it purported to be from a dealership. Defendant exhibited a greater degree of nervousness than most people during traffic stops. Finally, he considered Defendant's indirect route of travel, the conflicting accounts of their travel itinerary, and the impression that Defendant was making up her story as she went along. All of these facts, considered in the totality of the circumstances, gave him reasonable suspicion that criminal activity may have been afoot. Thus, Officer Johnston permissibly expanded the scope of the stop by asking about drugs or large amounts of currency, and then requesting consent to search the vehicle.

{39} We also note that in deciding that Officer Johnston impermissibly expanded the scope of the stop, the Court of Appeals did not consider all of the facts that Officer Johnston testified gave him reasonable suspicion to expand the scope of the stop. The Court of Appeals only noted four things that might have given rise to reasonable suspicion: the cell phone, the car jack, the overnight bag, and the smell of gasoline. *Duran*, 2003–NMCA–112, ¶ 20, 134 N.M. 367, 76 P.3d 1124. However, as the trial court noted, Officer Johnston testified that he relied on additional facts, such as Defendant was traveling on a drug trafficking route, the abnormal bill of sale, Defendant's indirect route of travel, Defendant's elevated level of nervousness, and the impression that Defendant was making her story up as she went along.

{40} Further, while we share the Court of Appeals' concern that Officer Johnston's testimony could have more fully explained exactly how he used his training and experience to determine that what he observed during the stop was indicative of criminal behavior, *see Duran*, 2003–NMCA–112, ¶ 20, 134 N.M. 367, 76 P.3d 1124, we nonetheless determine that under the totality of the circumstances the objects in the car combined with his other observations clearly support his conclusion that there was a likelihood of criminal activity afoot. What Officer Johnston observed was more than, as the Court of Appeals put it, merely "innocuous circumstances" or "facts that would seem innocent to a layperson." *Id.* Police officers should always explain with specificity how their training and experience led them to draw their conclusions when testifying at a hearing on a motion to suppress. Officer Johnston's testimony, while not perfect, sufficiently articulated the facts that gave him reasonable suspicion to expand the scope of the stop.

{41} Finally, the two Court of Appeals cases cited by the Court of Appeals to support its position are factually distinguishable. *See Taylor*, 1999–NMCA–022, 126 N.M. 569, 973 P.2d 246; *City of Albuquerque v. Haywood*, 1998–NMCA–029, 124 N.M. 661, 954 P.2d 93. In both *Taylor* and *Haywood*, the police officers immediately asked questions regarding drugs or weapons but did not testify as to any reasonable suspicion that such activity was taking place. Here, Officer Johnston did not immediately question either Defendant or Williams about drugs or weapons; instead, he observed facts surrounding the stop and asked questions about travel plans related to the stop that led him to reasonably believe that criminal activity was afoot. Questions about travel plans are different from questions about the presence of drugs or weapons. Questions about travel plans generally do not ask for information about an additional crime beyond that which justified the initial stop. *See Malone*, 683 N.W.2d at 13. Questions about drugs or weapons refer to a criminal act beyond what the officer stopped the car for in the first place. Thus, they constitute a separate and distinct line of questioning apart from and outside the scope of the initial justification for the stop that require a showing of reason-

able suspicion of other criminal activity. *Taylor* and *Haywood* continue to be good law based on their facts.

**CONCLUSION**

{42} The trial court properly denied Defendant's motion to suppress the marijuana seized. Officer Johnston's questions about Defendant's travel plans were reasonably related to the scope of the initial justification for the stop. Officer Johnston observed sufficient objective and articulable facts that gave him reasonable suspicion that criminal activity may have been afoot, thus justifying his expansion of the scope of the search or seizure to ask about the presence of drugs or large amounts of currency. Finally, Defendant's subsequent consent to the search and seizure was valid because we find no illegality in the questioning. Thus, Defendant's consent was not the fruit of an illegal search. *See State v. Jimmy R.*, 1997–NMCA–107, ¶ 7, 124 N.M. 45, 946 P.2d 648. We reverse the Court of Appeals and affirm the conviction.

{43} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and EDWARD L. CHÁVEZ, Justices.