# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2020-NMCA-042

Filing Date: June 9, 2020

No. A-1-CA-37467

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**CARROLL J. TUTON,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Released for Publication October 6, 2020.

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
MJ Edge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**IVES, Judge.**

**{1}** Defendant Carroll J. Tuton appeals his conviction for possession of methamphetamine in violation of NMSA 1978, Section 30-31-23(A) (2011, amended 2019), arguing that the district court erred by denying his motion to suppress 0.73 grams of methamphetamine a police officer found while searching his wallet during a traffic stop. We agree with Defendant that the expansion of the scope of the stop violated Article II, Section 10 of the New Mexico Constitution. Specifically, we conclude that the State did not establish that asking Defendant to name the friend whose house

he had come from was reasonably related to his traffic offenses or that this questioning was based on reasonable suspicion of any other offense. Because this violation of the State Constitution tainted Defendant's consent to search his wallet, we reverse the order denying Defendant's motion to suppress the fruits of that search.

**BACKGROUND**

**{2}**     At the suppression hearing, the State relied on the testimony of Officer Manuel Frias and Officer Kassidee Plumley of the Las Cruces Police Department. Officer Frias testified that he stopped Defendant's vehicle after observing Defendant fail to use his turn signal and fail to stop at a stop sign. During the stop, Defendant was "very nervous [and] shaky" and, at first, "belligerent" and "[un]cooperative." When Officer Frias asked Defendant for his driver's license and proof of vehicle registration and insurance, Defendant produced his license but not the other two documents. Officer Frias directed Defendant to step out of his vehicle to advise him of the traffic citation he was receiving and have him sign that citation.

**{3}**     With Defendant outside of his vehicle and before Defendant had signed the citation, Officer Frias asked Defendant where he was coming from; Defendant responded that he was coming from a friend's house. When Officer Frias asked which friend, Defendant identified the friend as Josh. Officer Frias then asked whether it was Josh Dimas—a person Officer Frias knew was under investigation for and had been previously convicted of drug trafficking—and Defendant replied that it was. Officer Frias then asked for and received Defendant's consent to search his vehicle. After completing this search, Officer Frias asked for and received Defendant's consent to pat him down and search his pockets. During the search of Defendant's pockets, Officer Frias found a wallet, which he handed to Officer Plumley, who had arrived as backup during the stop. Officer Plumley searched the wallet and found a clear plastic bag containing methamphetamine.

**{4}**     Officer Plumley testified that she observed Officer Frias talking to Defendant at the driver's side of Defendant's vehicle when she arrived at the scene. Defendant "appeared to be very nervous" inside of his vehicle, more so than most people are during traffic stops: he "kept grabbing for the steering wheel and then [putting his hands] back down" and "his hands were shaking." During the time that Officer Plumley was observing the interaction between Officer Frias and Defendant, they were having a "good natured discussion," and "nobody was being belligerent."

**{5}**     At the conclusion of the suppression hearing, the State argued that the law allowed the officers to expand the traffic stop to ask questions about where Defendant was coming from and that the request for consent was lawful. Defense counsel responded that the officers lacked reasonable suspicion to expand the scope of the stop, arguing, among other things, that Officer Frias expanded the stop illegally, which tainted any consent Defendant might have given. The district court denied Defendant's motion to suppress without explanation.

**{6}**     Defendant pled guilty to possession of methamphetamine in violation of Section 30-31-23(A). He appeals pursuant to a plea agreement that includes a provision allowing him to withdraw his guilty plea if he obtains a reversal of the order denying suppression.

**DISCUSSION**

**{7}**     Defendant argues that Officer Frias violated the Fourth Amendment of the United States Constitution and Article II, Section 10 of the New Mexico Constitution by expanding the scope of the traffic stop to question Defendant about where he had been before the traffic stop and, based on his responses, to request consent to search Defendant and the vehicle he was driving. Defendant contends that Officer Frias unreasonably extended the duration of the traffic stop and impermissibly deviated from the original justification for the stop by asking questions that were not reasonably related to traffic violations.

**{8}**     Our "review of a district court's decision regarding a motion to suppress evidence involves mixed questions of fact and law." *State v. Funderburg*, 2008-NMSC-026, ¶ 10, 144 N.M. 37, 183 P.3d 922 (internal quotation marks and citation omitted). "We review the motion in two parts[.]" *State v. Garcia*, 2005-NMSC-017, ¶ 27, 138 N.M. 1, 116 P.3d 72. First, we "review the factual analysis for substantial evidence." *Id.* Reviewing the entire record, we ask whether "there was sufficient evidence to support the [district] court's denial of the motion to suppress." *State v. Monafo*, 2016-NMCA-092, ¶ 10, 384 P.3d 134 (internal quotation marks and citation omitted). Unless the record is to the contrary, we presume that "the court believed all uncontradicted evidence." *State v. Jason L.*, 2000-NMSC-018, ¶ 11, 129 N.M. 119, 2 P.3d 856. In the absence of factual findings, "[w]hen the evidence conflicts, we consider the evidence that supports the district court's ruling[,]" and we "draw all inferences and indulge all presumptions in favor of [that] ruling." *Id.* Second, we undertake a de novo review of the legal analysis. *Garcia*, 2005-NMSC-017, ¶ 27. This entails assessing the totality of the circumstances to "decide the constitutional reasonableness of the police conduct" as a matter of law. *State v. Martinez*, 2020-NMSC-005, ¶ 16, 457 P.3d 254.

**{9}**     Drawing all inferences in favor of the district court's order denying the motion to suppress, we conclude that the Fourth Amendment allowed Officer Frias to ask Defendant the series of questions about where he had been. The United States Supreme Court has held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). "Authority for [a traffic stop] ends when tasks tied to the traffic infraction are—or reasonably should have been— completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Stated differently, an officer may investigate potential offenses other than the traffic offenses without reasonable suspicion, but the officer "may not do so in a way that prolongs the stop." *Id.* at 355. Under this precedent and considering the suppression hearing testimony in the light most favorable to the State, Officer Frias asked Defendant questions about his

prior whereabouts before he explained the traffic citations to Defendant and before Defendant had signed the citations, and the evidence does not suggest that the questioning at issue prolonged the stop or that Officer Frias took an unreasonable amount of time to investigate the traffic infractions. Accordingly, we conclude that the questions at issue did not render the detention unreasonable under the Fourth Amendment.

**{10}**     However, Article II, Section 10 mandates a different analysis—one designed to "ensure[] that investigating officers do not engage in 'fishing expeditions' during traffic stops."[1] *Leyva*, 2011-NMSC-009, ¶ 55. By contrast to the Fourth Amendment, "Article II, Section 10 [ordinarily] requires that all questions asked during the investigation of a traffic stop be reasonably related to the initial reason for the stop." *Leyva*, 2011-NMSC-009, ¶ 55. "Unrelated questions" are only justified (1) if "supported by independent reasonable suspicion," (2) "for reasons of officer safety," or (3) "if the interaction has developed into a consensual encounter." *Id.*; *see Bell*, 2015-NMCA-028, ¶ 16 ("[U]nder Article II, Section 10, both the duration and [the] scope of a stop must be reasonable under the circumstances and . . . even questions that do not prolong the encounter are improper if they are not reasonably related to the reason for the stop or otherwise supported by reasonable suspicion." (alteration, internal quotation marks, and citation omitted)). Questions about travel plans or history are not exempt from these requirements. *See, e.g.*, *State v. Duran*, 2005-NMSC-034, ¶ 37, 138 N.M. 414, 120 P.3d 836 (concluding that "limited questions about travel plans" were "reasonably related to the scope of the initial stop" for a misplaced registration sticker because the officer knew that "the stop was on a drug-courier route," the officer saw "strange and suspicious tools in the back of the car and smelled the raw odor of gasoline," and the defendant "presented an irregular bill of sale without normal paperwork"), *overruled on other grounds by Leyva*, 2011-NMSC-009, ¶¶ 17, 55 (explaining that the holding and reasoning of *Duran* are no longer valid under the Fourth Amendment, but affirming that *Duran*'s holding and reasoning continue to govern the scope of traffic stops under Article II, Section 10); *State v. Van Dang*, 2005-NMSC-033, ¶¶ 1, 5, 15, 138 N.M. 408,

---

[1]Defendant preserved his state constitutional claim by arguing in the district court that the detention and searches violated his rights under Article II, Section 10 and by developing a factual basis for that argument during the suppression hearing. *See State v. Leyva*, 2011-NMSC-009, ¶ 49, 149 N.M. 435, 250 P.3d 861 (clarifying that in order to preserve a state constitutional claim, if the state constitutional provision at issue has previously been interpreted more expansively than its federal counterpart, defense counsel "must develop the necessary factual base and raise the applicable [state] constitutional provision in trial court" (emphasis omitted)). *But cf. State v. Bell*, 2015-NMCA-028, ¶ 12 n.1, 345 P.3d 342 ("As clear as this controlling precedent now is, we question why it is any longer necessary that the simultaneously applicable protections of the Fourth Amendment and Article II, Section 10 must be independently preserved when challenging the constitutional legality of a vehicle stop in New Mexico. To require dual assertions of such persistently overlapping protections, known well to both attorneys and the judges in whose courts these issues are most frequently raised, unnecessarily risks the waiver of important protections to motorists' liberty. It is, however, for our Supreme Court to effectuate change to its own jurisprudence, and we review the [preservation issue] under *Leyva* and cases preceding it."); *id.* ¶ 24 (Sutin, J., specially concurring) ("It is time to hold that in search and seizure cases our courts will automatically examine whether relief under Article II, Section 10 . . . should be available when it appears that relief is unavailable under the Fourth Amendment.").

120 P.3d 830 (holding that questions about a driver's travel plans were reasonable because the absence of driver's name on a vehicle rental contract gave "the officer . . . a right to investigate whether the vehicle was stolen"); *see also Funderburg*, 2008-NMSC-026, ¶¶ 26-28 (recognizing that officers may ask questions about travel based on circumstances that evolve after the stop).

**{11}** Here, the State does not contend, and the suppression hearing evidence provides no basis for concluding, that Officer Frias's questions were designed to protect the officers or that the questioning occurred during a consensual encounter after the traffic stop ended. Accordingly, Officer Frias's questions about where Defendant had come from, and upon learning he had come from a friend's house, about the friend's name were only allowed under Article II, Section 10 if those questions were either reasonably related to the reason for the stop or based on reasonable suspicion that Defendant might have committed some other offense.

**{12}** The State has not established that the questions pass muster under either alternative. Neither officer articulated any connection between the investigation of the stop sign and turn signal violations that justified the traffic stop at its inception and the inquiry regarding Defendant's travel history. And the progression of Officer Frias's questioning does not allow us to draw any reasonable inference relating that questioning to the reason for the stop. Even granting that a simple inquiry into where Defendant was coming from could have had some relation to the investigation of the traffic offenses at issue here, the name of the friend whose house Defendant had been visiting and whether Defendant's friend Josh was Josh Dimas plainly did not. The intrusiveness of this questioning consequently exceeded the degree permissible under the New Mexico Constitution unless the questions were supported by independent reasonable suspicion. *See Bell*, 2015-NMCA-028, ¶ 19 ("When a motorist is subjected to inquiries unsupported by reasonable suspicion during a vehicle stop, . . . the continuing detention of that person is illegal.").

**{13}** They were not. Although Officer Frias discovered potential registration and insurance violations during the stop, the testimony at the suppression hearing did not connect his questioning to those offenses either. Nor did it tie these separate violations to Officer Frias's investigation of any other potential crime. During the suppression hearing, the State presented no evidence that, at the time Officer Frias inquired about the name of Defendant's friend, he had any reasonable basis for suspecting that Defendant had committed a drug offense. But neither the officers nor the State identified any other offense that Officer Frias could have been investigating by asking Defendant which friend he had been visiting and whether that friend was a person Officer Frias knew to be involved in drug trafficking. As the State candidly acknowledges, Officer Frias learned the only information that arguably gave the officers reasonable suspicion of a drug offense *after* he asked the questions at issue—from Defendant's answers to those questions. Because facts discovered as a result of a seizure have no bearing on the legality of that seizure, *Jason L.*, 2000-NMSC-018, ¶ 20, Defendant's answers to Officer Frias's questions may not be used to justify expanding the scope of the detention to ask the questions in the first place.

**{14}** The traffic, registration, and insurance violations did not support the officers' expansion of the scope of the investigation even when considered in conjunction with Defendant's demeanor: his unusual degree of nervousness and his hostility toward Officer Frias at the outset of the stop. Our Supreme Court has made clear that its precedent does not "equat[e] simple nervousness with reasonable suspicion." *State v. Neal*, 2007-NMSC-043, ¶ 29, 142 N.M. 176, 164 P.3d 57 (holding that a defendant's "fidgety and nervous demeanor . . . did not suffice to create reasonable suspicion" (internal quotation marks and citation omitted)); *see, e.g.*, *State v. Portillo*, 2011-NMCA-079, ¶ 23, 150 N.M. 187, 258 P.3d 466 (concluding that an officer lacked reasonable suspicion to expand the scope of a traffic stop by asking the driver questions about drugs and weapons where the prosecution relied exclusively on the driver's abnormal demeanor, which included looking straight ahead and failing to make eye contact except for "a single furtive glance"). Demeanor is only one factor to be considered in weighing the totality of the circumstances, and those circumstances as a whole must be reasonably connected to the expansion of an investigation. *See, e.g.*, *State v. Olson*, 2012-NMSC-035, ¶ 15, 285 P.3d 1066 (holding that an officer had reasonable suspicion to investigate a driver for soliciting prostitution during a traffic stop for an expired license plate where the defendant made "an unusual maneuver" after seeing the officer's marked patrol car and then "avoided eye contact" after his vehicle was stopped; the stop occurred late at night in an area where the officer had seen prostitutes working; and the officer recognized the passenger as a person who had worked as a prostitute); *Duran*, 2005-NMSC-034, ¶¶ 37-39 (holding that an officer had reasonable suspicion to investigate a driver for drug offenses based on the driver's unusual degree of nervousness where the officer "observed the strange and suspicious tools in the back of the car and smelled the raw odor of gasoline"; the fact that the driver was "traveling on a drug trafficking route," one that was indirect for the driver; and the officer's "impression that [the d]efendant was making her story up as she went along"); *State v. Pacheco*, 2008-NMCA-131, ¶ 16, 145 N.M. 40, 193 P.3d 587 (holding that an officer had reasonable suspicion to investigate a driver for drug-related activity during traffic stop based on the driver's "excessive nervousness" as well as "the strong odor of air freshener, heavy perfume, or after shave emanating from the vehicle, which [the officer] stated in his experience is frequently used by traffickers to conceal the odor of narcotics"; "the driver's inability to produce a valid driver's license"; a "strange situation with regard to the ownership and registration of the vehicle, including the driver's inability to identify the source of authorization to operate the vehicle"; and apparent inconsistencies between the travel plan descriptions given by the driver and the passenger); *cf. State v. Vandenberg*, 2003-NMSC-030, ¶ 28, 134 N.M. 566, 81 P.3d 19 (holding that the officer had reasonable suspicion to conduct a pat down during a traffic stop based on the driver's "extreme nervousness" and additional "specific observations of the suspect's conduct" that raised concerns about officer safety). Neither officer articulated a specific reason why Defendant's demeanor, in combination with other facts known at the time of the questioning at issue, gave the officers a reasonable basis for suspecting Defendant of any crimes other than traffic, registration, and insurance offenses. *Cf. Vandenberg*, 2003-NMSC-030, ¶ 31 ("[I]t is not the degree of nervousness that allows the officer to pat a defendant down, but instead it is the articulation by the officer of specific reasons why the nervousness displayed by the defendant caused the

officer to reasonably believe that his or her safety would be compromised." (internal quotation marks and citation omitted)). On the record before us, Defendant's nervousness while being investigated for violating traffic laws and not having proof of registration and insurance did not give rise to a reasonable suspicion sufficient to justify asking Defendant which friend he had been visiting and whether that friend was Josh Dimas, a person the officer believed to be involved in drug trafficking.

**{15}** The State has not established that Officer Frias's questions were reasonably related to the traffic offenses under investigation or that the questions were based on reasonable suspicion of Defendant's involvement in any other offenses. We hold that the questioning amounted to a "fishing expedition" that violated Defendant's state constitutional right to be free from unreasonable seizures.[2] *Leyva*, 2011-NMSC-009, ¶ 55.

**{16}** The remedy is suppression of the methamphetamine officers discovered during the search of Defendant's wallet that occurred as a result of this unconstitutional detention. "An illegal stop taints any subsequent consent to search[,]" and the burden is on the prosecution to show sufficient attenuation between the illegality and the consent to search. *State v. Figueroa*, 2010-NMCA-048, ¶ 34, 148 N.M. 811, 242 P.3d 378; *see also Bell*, 2015-NMCA-028, ¶ 19 ("It is . . . settled law that evidence discovered as a result of the exploitation of an illegal seizure must be suppressed unless it has been purged of its primary taint." (internal quotation marks and citation omitted)). Because the State has not attempted to shoulder this burden, we hold that the fruits of the search must be suppressed.

**CONCLUSION**

**{17}** We reverse the order denying Defendant's motion to suppress and remand for further proceedings consistent with this opinion.

**{18} IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Chief Judge**

**MEGAN P. DUFFY, Judge**

---

[2]Having concluded that the questioning at issue unreasonably expanded the scope of the traffic stop, we need not address Defendant's argument that the officers unconstitutionally expanded the traffic stop in order to tow his vehicle or his other arguments under Fourth Amendment.