**Certiorari Granted, May 24, 2011, Docket No. 32,976**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-056**

**Filing Date: April 8, 2011**

**Docket No. 29,010**

**STATE OF NEW MEXICO,**

    **Plaintiff-Appellee,**

**v.**

**GUNNAR OLSON,**

    **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Neil C. Candelaria, District Judge**

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellee

Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}** Defendant Gunnar Olson pleaded no contest to possession of a controlled substance (cocaine). He reserved his right to appeal from the judgment convicting him of that offense upon a "guilty plea" in order to attack the court's denial of his motion to suppress evidence. He now appeals from the judgment and asks this Court to reverse the district court's denial

of his motion to suppress on the grounds that the search and seizure of his person and property violated the United States and New Mexico Constitutions. We reverse.

**BACKGROUND**

{2}    As factual background, we have only the testimony offered by Officer Trey Economidy, the officer who conducted the search and seizure of Defendant. On an evening in December 2007, just prior to 12:30 a.m., Officer Economidy was parked in his patrol car in an alley behind a convenience store near the intersection of University Boulevard and Central Avenue in Albuquerque, New Mexico. Defendant drove his vehicle into the alley, then pulled back out and continued on University Boulevard. Officer Economidy found this behavior suspicious "[b]ecause the vehicle pulls in the alley, doesn't conduct any business in the alley, kind of sees me in my marked police unit, kind of gives me the impression like, oh, no, the police, then backs out and then heads back southbound." Because of the suspicious behavior, the officer pulled out of the alley to follow Defendant. Upon seeing a "significantly expired" temporary tag, he conducted a traffic stop.

{3}    Officer Economidy approached Defendant's vehicle alone because he was not patrolling with a partner. Defendant had already begun "digging for paperwork" when the officer approached, and Defendant did not make eye contact with him. The officer recognized right away that Defendant had a passenger known to the officer to be a prostitute. The officer had previous law enforcement interactions with the prostitute and knew the passenger by name. "It was a known male[-]dressed[-]female prostitute[.]"

{4}    "[P]retty much immediately" after the stop, the officer requested Defendant to exit the car. Requiring the driver to exit the vehicle was the officer's typical practice where there was a known prostitute involved, so that the officer could interview the driver and passenger separately and see how they knew one another and what business they had with each other that evening. After Defendant was out of the car, the officer asked him who his passenger was, "at which point he told me it was him." Defendant also told the officer that the transvestite, "Emily," was a friend he had known for about a year and was a "working girl," but was not working that evening and that he was "just giving her a ride." At this point, the officer was investigating possible criminal solicitation of prostitution. The officer asked if Defendant had any weapons or anything illegal on his person because he saw that Defendant was holding a fanny pack like a purse. In response, Defendant responded that he did not "believe in violence." The officer explained to Defendant that his temporary tag was "significantly expired" and asked what Defendant was doing in the alley. Defendant replied that he saw the officer in the alley and he "didn't know if there was something going on, so he backed out."

{5}    For his safety, the officer had Defendant place the fanny pack on the hood while he continued the interview. He asked Defendant if he had a driver's license on him. Defendant "went to the fanny pack" as though he was possibly going to retrieve his identification from it, the officer asked Defendant if his identification was in the fanny pack, and Defendant said

2

it was. Still concerned that Defendant might have had "a gun or knives or any kind of edge weapon" in the fanny pack, for safety reasons the officer asked Defendant if he could "take a look to make sure there [was] no weapon in the fanny pack before [Defendant] started grabbing things out of it[.]" Defendant consented to the officer looking in the fanny pack for weapons.

{6}     The officer looked in the fanny pack and saw "two glass crack pipes and one metal crack pipe in one of the far compartments that was in the back zipper that would be closest to your body." When questioned by the officer about the pipes, Defendant admitted to using the pipes to smoke cocaine. Defendant was placed under arrest, and the officer asked him where his cocaine was. Defendant said it was in his front pocket. The officer found the cocaine in a container pulled from Defendant's front pocket.

{7}     Defendant moved to suppress all evidence obtained as a result of the search and seizure. In his motion, Defendant argued that the officer did not have reasonable, articulable suspicion of any criminal activity on his part beyond a traffic violation and did not have authority to ask him to step out of the vehicle. Defendant further argued that the officer did not have probable cause or reasonable suspicion of any criminal activity to support a warrantless search or seizure of the fanny pack. He also argued that his consent to search was not voluntary.

{8}     The district court denied Defendant's motion to suppress. In sum, the court's reasoning was that it found nothing in the evidence that would cause it to conclude that the officer's actions were unreasonable in any way. The court further found that Defendant was not coerced or threatened in any way and that his consent to search the fanny pack was given knowingly, voluntarily, and intelligently. After entry of his plea, Defendant reserved his right to appeal on the ground that the denial of his suppression motion constituted reversible error.

{9}     Defendant contends that his rights under the United States and New Mexico Constitutions were violated by the warrantless search of his person and property and without a valid exception to the warrant requirement. In support of this contention, Defendant argues that the officer illegally expanded the scope of the traffic stop, without reasonable suspicion or concern for safety. Defendant also argues that consent to search his fanny pack was not voluntarily given and that his consent was not purged of the Fourth Amendment violation.

**DISCUSSION**

**Standard of Review and Related Rules**

{10}     A motion to suppress evidence based on an alleged unlawful detention involves a mixed question of fact and law. Our review procedure is set out in *State v. Leyva*, 2011-NMSC-009, ¶ 30, ___ N.M. ___, ___ P.3d ___, *State v. Funderburg*, 2008-NMSC-026, ¶ 10, 144 N.M. 37, 183 P.3d 922, and *State v. Vandenberg*, 2003-NMSC-030, ¶¶ 17-19, 134 N.M. 566, 81 P.3d 19. In the present case, we review de novo whether the officer's actions were objectively reasonable; this includes addressing whether reasonable suspicion or safety

concerns existed to support the officer's questioning and continuing detention on matters unrelated to the reasons for the traffic stop. *Leyva*, 2011-NMSC-009, ¶ 30; *Vandenberg*, 2003-NMSC-030, ¶ 19. We look at the totality of circumstances. *Leyva*, 2011-NMSC-009, ¶¶ 30, 59; *Vandenberg*, 2003-NMSC-030, ¶ 19. "By assessing the totality of circumstances, we recognize that officers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *State v. Neal*, 2007-NMSC-043, ¶ 21, 142 N.M. 176, 164 P.3d 57 (internal quotation marks and citation omitted). We examine the evolving circumstances facing the officer. *State v. Sewell*, 2009-NMSC-033, ¶ 22, 146 N.M. 428, 211 P.3d 885; *Funderburg*, 2008-NMSC-026, ¶ 16; *State v. Duran*, 2005-NMSC-034, ¶ 36, 138 N.M. 414, 120 P.3d 836. We consider whether an "officer's . . . actions were fairly responsive to the emerging tableau—the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *Funderburg*, 2008-NMSC-026, ¶ 27 (internal quotation marks and citation omitted).

**Expansion of the Traffic Stop Tests**

**{11}** "The [F]ederal and New Mexico Constitutions are not a guarantee against all searches and seizures, only unreasonable ones." *Sewell*, 2009-NMSC-033, ¶ 16 (internal quotation marks and citation omitted). New Mexico courts apply a two-part test to analyze the reasonableness of an officer's actions during a traffic stop under the Fourth Amendment to the Federal Constitution. *Leyva*, 2011-NMSC-009, ¶¶ 10, 31; *Duran*, 2005-NMSC-034, ¶ 23. First, we must ascertain whether the traffic stop was justified at its inception. *Leyva*, 2011-NMSC-009, ¶ 31; *Duran*, 2005-NMSC-034, ¶ 23. The requirements under the second part of the test are different depending on whether we are analyzing Fourth Amendment protections or protections under Article II, Section 10 of the New Mexico Constitution. *See Leyva*, 2011-NMSC-009, ¶¶ 10-35 (setting out the analysis under the Fourth Amendment); *see also id.* ¶¶ 52-61 (setting out the analysis under Article II, Section 10).

**{12}** Defendant concedes that under the first test in the analysis there existed reasonable suspicion for the traffic stop. Defendant was driving with an expired temporary registration tag. This constituted a traffic violation, which supplied an appropriate basis for the traffic stop. *See, e.g.*, *Vandenberg*, 2003-NMSC-030, ¶ 21 (noting that suspicion of violating a traffic law supplies the initial justification for stopping a vehicle); *cf. Leyva*, 2011-NMSC-009, ¶¶ 31, 58 (stating that the defendant conceded that the initial stop for excessive speed was reasonable).

**{13}** Relating to the second test in the analysis, Defendant argues that the officer's actions after the initial stop violated the Fourth Amendment, but if this Court were to determine that the Fourth Amendment was not violated, Defendant argues that Article II, Section 10 provides greater protection and the officer's actions violated Article II, Section 10. In oral argument based on the filing of *Leyva* while this case was pending on appeal, the State conceded that Defendant preserved an Article II, Section 10 argument. Defendant alerted the district court by citing Article II, Section 10, and the facts surrounding the officer's actions in detaining and asking questions were before the district court. *See Leyva*, 2011-NMSC-009, ¶¶ 49-51 (stating that, because Article II, Section 10 had previously been

4

interpreted more expansively than the Fourth Amendment trial counsel need only "plead[] that his right to be free from an unreasonable search and seizure was violated under both the Fourth Amendment and Article II, Section 10" and "develop the necessary factual base").

**{14}**     *Leyva* refers to the Fourth Amendment test as a "bright-line temporal test[][.]" *Id.* ¶¶ 53-55. The focus of the Fourth Amendment inquiry is whether the officer's questioning "did not measurably extend the length of the valid stop; that is, whether the questioning exceeded the temporal limitations on the scope of the investigation." *Id.* ¶ 31. Temporal limitations are to be analyzed based on whether the questioning "was a permissible de minimis extension of a valid stop" and whether they "measurably extend[ed] the length of the valid stop[.]" *Id.* ¶¶ 31, 33, 35.

**{15}**     Significantly different than that in the Fourth Amendment test, the Article II, Section 10 test is expressed by our Supreme Court in *Leyva* as follows.

> Article II, Section 10 requires that all questions asked during the investigation of a traffic stop be reasonably related to the initial reason for the stop. Unrelated questions are permissible when supported by independent reasonable suspicion, for reasons of officer safety, or if the interaction has developed into a consensual encounter. The overall reasonableness of the stop continues to be determined by balancing the public interest in the enforcement of traffic laws against an individual's right to liberty, privacy, and freedom from arbitrary police interference.

*Leyva*, 2011-NMSC-009, ¶ 55 (internal quotation marks and citations omitted). "Reasonable suspicion is measured by an objective standard based on the totality of the circumstances." *Id.* ¶¶ 59, 61. "[R]easonable suspicion is a commonsense, nontechnical conception, which requires that officers articulate a reason, beyond a mere hunch, for their belief that an individual has committed a criminal act." *Funderburg*, 2008-NMSC-026, ¶ 15 (alteration omitted) (internal quotation marks and citation omitted).

**Inquiry Related to Prostitution**

**{16}**     In the present case, the officer quickly focused his investigation on prostitution because of the passenger's identity and the passenger's clothing and makeup. There exist several criminal statutes relating to prostitution. *See* NMSA 1978, §§ 30-9-2 to -9 (1963, as amended through 1989). Relevant here are the statutes criminalizing prostitution and patronizing prostitutes. *See* § 30-9-2 (making it a crime to knowingly offer to engage in a sexual act for hire); § 30-9-3(B) (defining patronizing a prostitute as "knowingly hiring or offering to hire a prostitute, or one believed by the offeror to be a prostitute, to engage in a sexual act with the actor or another"). Based on his experience of driving down Central Avenue, it was "pretty obvious" who was a "working person[,]" "as well as the clothing a lot of times and the heavy makeup." To the officer, "it was pretty obvious that [the prostitute] was a working . . . person in this case." The officer testified he "pretty much immediately" asked Defendant to step out of the car because this is what the officer typically would do when the investigation involves a known prostitute, in order to inquire separately

5

into the circumstances and to ask how they know each other and what business they have with each other.

**{17}**     In line with *Leyva*'s requirement that "all questions asked . . . be reasonably related to the initial reason for the stop" and that "[u]nrelated questions" are not permissible unless they are supported by "independent reasonable suspicion," 2011-NMSC-009, ¶ 55, we hold that under Article II, Section 10, the officer did not have sufficient independent articulable and reasonable suspicion to expand the scope of the initial detention for the further inquiry regarding Defendant's relationship with the prostitute.  The only circumstances possibly giving rise to suspicion of solicitation of a prostitute before the officer began his immediate inquiry relating to solicitation of prostitution were the officer's having seen Defendant's vehicle pull into and then out of an alley at 12:30 a.m., after which, upon stopping the vehicle for a traffic violation, the officer saw the passenger, a person he knew was a transvestite prostitute.  These very limited circumstances are insufficient to meet the standard of reasonable and articulable suspicion that Defendant had knowingly hired or offered to hire his passenger to engage in a sexual act.  Were we to hold otherwise, police officers would have carte blanche based on suspicion of solicitation of a prostitute to stop any vehicle late at night whenever he saw a driver and a known prostitute in the vehicle, to require the driver to exit the vehicle, and to question the driver and the passenger regarding their relationship.  That conduct, no different than the conduct in the present case, is tantamount to a seizure of a driver based on the mere presence of a passenger known to have committed a past criminal act.  *Cf. State v. Affsprung*, 2004-NMCA-038, ¶¶ 4, 20-21, 135 N.M. 306, 87 P.3d 1088 (holding that an officer's request of a passenger who "was present solely by virtue of the coincidence he was a passenger" for the passenger's identification just because the officer wanted to know who he was dealing with for safety purposes constituted an unlawful detention); *State v. Jones*, 114 N.M. 147, 151, 835 P.2d 863, 867 (Ct. App. 1992) (refusing to "make the final leap of faith . . . that [an] inference arising from gang membership and presence in a gang activity area [was] sufficient alone to support reasonable suspicion").  Such a seizure, or extended detention, as the case may be, is based on no more than hunch or speculation of ongoing criminal conduct.  It is closer to arbitrary or harassing police conduct than to society's need for reasonable law enforcement investigative activity.

**{18}**     Because we determine that Defendant was unlawfully detained in violation of Article II, Section 10, his consent to search and the search itself were not purged of taint, and it was error not to grant Defendant's motion to suppress.

**CONCLUSION**

**{19}**     We reverse the district court's denial of Defendant's motion to suppress.  The motion should have been granted, and the evidence obtained in the search should be suppressed.

**{20}     IT IS SO ORDERED.**

_____
 **JONATHAN B. SUTIN, Judge**

6

**WE CONCUR:**

_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**TIMOTHY L. GARCIA, Judge**


**Topic Index for *State v. Olson*, Docket No. 29,010**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-FE | Fundamental Error |
| AE-SR | Standard of Review |
| | |
| **CT** | **CONSTITUTIONAL LAW** |
| CT-FA | Fourth Amendment |
| CT-SU | Suppression of Evidence |
| | |
| **CL** | **CRIMINAL LAW** |
| CL-CL | Controlled Substances |
| CL-MH | Motor Vehicle Violations |
| | |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-MR | Motion to Suppress |
| CA-SZ | Search and Seizure |