This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                          **NO.  30,539**

**EDWARD RABER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LUNA COUNTY**
**Gary Jeffreys, District Judge**

Gary K. King, Attorney General
William Lazar, Assistant Attorney General
Santa Fe, NM

for Appellee

Liane E. Kerr
Albuquerque, NM

for Appellant

## MEMORANDUM OPINION

**BUSTAMANTE, Judge.**

Defendant Edward Raber was traveling as a passenger in a vehicle he had rented when Officer Johnston pulled the vehicle over to investigate a traffic violation. After determining that no violation had occurred and verifying that Defendant was in fact the person listed on the rental contract, Officer Johnston continued to question Defendant about his travel plans. Because we hold that these additional questions violated Article II, Section 10 of the New Mexico Constitution, we reverse the order denying Defendant's motion to suppress.

## I.    BACKGROUND

Late at night on June 11, 2009, Officer Johnston looked in his rearview mirror and noticed that the car that had just passed him going the opposite direction did not have a license plate. The officer turned around and stopped the car. Upon approaching the car, the officer noticed that the license plate holder contained a placard for Whitehead Chevrolet and that a demo permit was located in the left corner of the rear window. He had not previously been able to see the dealer permit because it was above the beam of his headlights.

The officer asked the driver, Ms. Stephens, for her license and registration. Ms. Stephens provided her license and a document showing that Defendant, who was a passenger, had rented the vehicle from Whitehead Auto Sales. Defendant also

provided his identification. Defendant explained that Ms. Stephens was driving because his license was suspended.

Officer Johnston asked Ms. Stephens to accompany him to his patrol car. While he waited for the results from the license check and wants and warrants check, he examined the rental contract, noticing that Ms. Stephens was not listed as an authorized driver. The contract also indicated that Defendant was unemployed but had paid cash for the rental. Officer Johnston asked Ms. Stephens about her travel plans, and she told him that she and Defendant were returning from the Phoenix-Tucson area, where they had attended a funeral. The officer testified that Ms. Stephens was extremely nervous, and at one point had trouble lighting a cigarette because her hands were shaking. At this point, the officer told Ms. Stephens that he did not plan on issuing a citation since the dealer's placement of the demo permit was not her fault.

Leaving Ms. Stephens near his vehicle, the officer next went back to the rental car to return Defendant's identification. He asked Defendant where the pair had been traveling, and Defendant responded that they were returning from "Tucson, Phoenix" and that they had been visiting relatives. The officer testified that when he was speaking to Defendant, he noticed that Defendant was "fidgety," that he seemed to be having a hard time concentrating, and that his eyes were bloodshot and glassy, with

3

pupils like "pinholes." The officer testified that he was concerned that the driver and passenger might "be under the influence of some drug or narcotic."

The officer returned once again to his car, where he gave Ms. Stephens her papers and told her to have a good night. As he was handing back the documents, he asked her, "Oh, who passed away?" The officer testified that Ms. Stephens' "whole demeanor changed, and she quit smiling and she looked down and was unsure what to say." Nevertheless, the officer told Ms. Stephens that he was not going to issue a citation and that she was free to go.

As Ms. Stephens was walking away, the officer called her back, saying that she was free to leave but that he would like to ask her some more questions. Officer Johnston testified that at this point, the circumstances led him to believe that the pair might be transporting drugs. When Officer Johnston questioned Ms. Stephens about the funeral, Ms. Stephens gave varied and conflicting responses about the funeral. The officer then separately questioned Defendant about his travel. Defendant did not mention a funeral.

Finally, the officer asked Defendant whether there were drugs or large amounts of cash in the car. When Defendant claimed that there were not, the officer asked if he could search the vehicle for drugs. Defendant and Ms. Stephens gave both verbal and written consent to the search. Officer Johnston and Officer Wood, who had

4

shown up to assist, eventually discovered a cigarette box containing approximately two grams of methamphetamine and six tablets of flexeril. Defendant indicated that the drugs were his and that Ms. Stephens knew nothing about them. Defendant was then arrested. Although Officer Johnston still harbored suspicions about Ms. Stephens' involvement, he decided it was preferable to let her drive the child home than to arrest her, which would have involved CYFD.

Defendant moved to suppress, arguing that the evidence was tainted by impermissible questioning after the officer had determined that Ms. Stephens and Defendant had valid paperwork and that no traffic infraction had occurred. The district court denied the motion to suppress. In support of the denial, the court made numerous findings of fact. The court found that Defendant and Ms. Stephens had given differing accounts of their trip, that they were traveling late at night on a route commonly used by drug traffickers, that they were coming from a source city known for methamphetamine trafficking, that Defendant had paid for the rental car with cash despite the fact that he was unemployed and did not have a valid driver's license, that Defendant had bloodshot eyes and pupils like pinholes, and that the driver was extremely fidgety and nervous. However, the court did not indicate when each of these facts became known to the officer. Additionally, the court appears not to have analyzed any of the officer's questions individually in light of what was known to the

officer at that time. Instead, the court issued a general conclusion that the officer "had reasonable suspicion to extend the duration of the traffic stop of defendant's rental vehicle and ask additional questions to quell his suspicions that defendant may be involved in criminal activity."

## II.   DISCUSSION

Defendant asserts that his rights under both the Fourth Amendment and the New Mexico Constitution were violated when, after Officer Johnston had decided not to issue a citation and told the driver she was free to go, the officer continued to question Defendant and the driver. The State argues that the questions did not measurably extend the duration of the stop and that the questions about drugs were supported by independent reasonable suspicion. The State concedes that the detention was not consensual and that officer safety is not at issue in this case. The question before us is whether the consent for the searches was tainted by questions asked during the non-consensual detention.

"New Mexico courts apply a two-part test to analyze the reasonableness of an officer's actions during a traffic stop under the Fourth Amendment to the Federal Constitution." *State v. Olson*, 2011-NMCA-056, ¶ 11, 150 N.M. 348, 258 P.3d 1140, *cert. granted*, 2011-NMCERT-005, 150 N.M. 348, 258 P.3d 1140. First, the stop must be justified at its inception. *See State v. Leyva*, 2011-NMSC-009, ¶ 31, 149

6

N.M. 435, 250 P.3d 861. The parties do not dispute that the officer was justified in pulling over Defendant's rental car when he was unable to see a license plate or temporary tag.

The second part of the analysis depends on whether the analysis is made under the Fourth Amendment or under Article II, Section 10. *Olson*, 2011-NMCA-056, ¶ 11. We therefore apply our interstitial approach, examining first whether the right being asserted is protected under the Fourth Amendment, and, if it was not, proceeding to whether it is protected under the New Mexico Constitution. *See State v. Gomez*, 1997-NMSC-006, ¶ 19, 122 N.M. 777, 932 P.2d 1.

Review of a motion to suppress involves mixed questions of fact and law. *State v. Urioste*, 2002-NMSC-023, ¶ 6, 132 N.M. 592, 52 P.3d 964.

> We review any factual questions under a substantial evidence standard and we review the application of law to the facts de novo. We first review the facts found by the district court, recognizing that the district court has the best vantage from which to resolve questions of fact and to evaluate witness credibility. Accordingly, we review the facts in the light most favorable to the prevailing party, deferring to the district court's factual findings so long as substantial evidence exists to support those findings. We then review the application of the law to those facts, making a de novo determination of the constitutional reasonableness of a search or seizure.

*State v. Sewell*, 2009-NMSC-033, ¶ 12, 146 N.M. 428, 211 P.3d 885 (alteration omitted) (internal quotation marks and citations omitted). The standard of review is

the same under both the Fourth Amendment and Article II, Section 10. *Leyva*, 2011-NMSC-009, ¶ 57.

## A. Fourth Amendment

We begin with the Fourth Amendment. The focus of the Fourth Amendment analysis is on the duration of the stop, not the content of the questions. *See Leyva*, 2011-NMSC-009, ¶ 17. So long as a question does not measurably extend the initial investigation, it is reasonable. *See id.* ¶ 29. Questions that measurably extend the investigation must be supported by reasonable suspicion of criminal activity, concern for police safety, or consent. *Id.* Of course, reasonable suspicion can develop during the duration of the initial investigation. *See id.* ¶ 19.

In *Leyva*, an officer saw what appeared to be a driver hiding something under his seat as he was being pulled over for speeding. *Id.* ¶ 4. Immediately after the officer finished his traffic investigation and issued citations, the officer asked the driver whether there were any guns or drugs in the car. *Id.* ¶¶ 5, 33. The question added only ten seconds to the ten-minute stop. *Id.* ¶ 33. Our Supreme Court held that the question did not violate the Fourth Amendment because it was a "de minimis extension of a valid stop posed for reasons of officer safety." *Id.* ¶ 35.

With respect to the Fourth Amendment, the instant case is quite similar to *Leyva*. The district court found that the duration of the stop was brief. The officer appears to have diligently proceeded with the traffic stop, completing it in seven or eight minutes. During that time, the officer observed that Ms. Stephens was extremely

nervous, that there was a slight discrepancy between her story and Defendant's story, that Defendant may have been under the influence of drugs, and that the couple were traveling on a public highway commonly used by drug traffickers. Immediately after the stop concluded, the officer asked Ms. Stephens who had died. This question added only seconds to a seven- or eight-minute stop. Her answer left the officer convinced that she was making up her story. Looking at all of these circumstances together, we conclude that at this point the officer had sufficient reasonable suspicion to justify expanding his investigation by questioning the couple about their travel plans and about whether there were drugs in the car. Accordingly, there was no Fourth Amendment violation in this case.

**B.      Article II, Section 10**

As an initial matter, we note that many of our Fourth Amendment cases have been overruled by *Leyva*. However, to the extent that those cases analyze searches and seizures using the analysis from *State v. Duran*, 2005-NMSC-034, 138 N.M. 414, 120 P.3d 836, *overruled by Leyva*, 2011-NMSC-009, ¶ 3, which in turn relied on *Terry v. Ohio*, 392 U.S. 1 (1968), we understand *Leyva* to mean that the analysis in those cases is still at least persuasive, if not binding, under Article II, Section 10. *See Leyva*, 2011-NMSC-009, ¶ 3 ("[W]e maintain the *Duran* standard for reviewing

searches and seizures under the New Mexico Constitution."). Our reliance in this section upon cases overruled by *Leyva* is made with this understanding.

*Leyva* summarizes the *Duran* standard as follows:

> Article II, Section 10 requires that all questions asked during the investigation of a traffic stop be reasonably related to the initial reason for the stop. Unrelated questions are permissible when supported by independent reasonable suspicion, for reasons of officer safety, or if the interaction has developed into a consensual encounter.

*Leyva*, 2011-NMSC-009, ¶ 55. An officer "does not have to ignore new information that becomes known to him after the initial stop," but may take into account "the circumstances originally warranting the stop, informed by what occurred, and what the officer learned, as the stop progressed." *Sewell*, 2009-NMSC-033, ¶ 19 (internal quotation marks and citations omitted). This test provides greater protection than the bright-line temporal test of the Fourth Amendment and "ensures that investigating officers do not engage in 'fishing expeditions' during traffic stops." *See Leyva*, 2011-NMSC-009, ¶ 55.

The State contends that the district court correctly concluded that the instant case was analogous to *Duran*. In *Duran*, an officer pulled over a vehicle with no license plate whose temporary tag was improperly displayed. 2005-NMSC-034, ¶ 3. When he approached the car, he observed that it contained various tools and smelled of gasoline. *Id.* ¶ 4. As in this case, the officer separated the driver from the

passenger and asked the driver about her travel plans while he ran the wants and warrants check. *Id.* ¶¶ 5, 8. He discovered that there were numerous irregularities in the purchase paperwork and that the driver, who had recently purchased the vehicle, was not familiar with the basic details of the sale of the vehicle. *Id.* ¶¶ 7, 11-12. He questioned the passenger separately and was given a dramatically different story of their travel plans. *See id.* ¶ 9. The officer issued a citation for the misplaced temporary tag and then asked whether there were drugs in the car. *Id.* ¶¶ 14-15. When the driver and passenger denied the presence of drugs in the car, the officer obtained verbal and written consent to search. *Id.* ¶ 15. He then immediately searched in the gas tank and found thirteen bags of marijuana. *Id.* ¶ 16.

The State appealed this Court's determination that the officer's questions about the driver's travel plans were impermissible. *Id.* ¶ 21. Our Supreme Court began its analysis by noting that "all questions asked by police officers during a traffic stop must be analyzed to ensure they are reasonably related to the initial justification for the stop or are supported by reasonable suspicion." *Id.* ¶ 35. It then observed that the "strange or suspicious circumstances surrounding the initial justification for the traffic stop" did not provide reasonable suspicion. *Id.* ¶ 37. However, it reasoned that the questions about travel plans were reasonably related to the scope of the initial stop because they were "minimally intrusive questions to confirm or dispel [the officer's]

12

initial suspicion after [the driver] told him of the circuitous route she was driving." *Id.* In other words, the questions about travel plans were justified by the driver's answers to those questions. Although the Court did not discuss or identify any specific State interests, it nevertheless concluded by stating that the State's "strong interest in asking the questions outweighed the limited intrusion into [the driver's] privacy." *Id.*

The standard from *Duran* thus appears to present a rather low barrier for police questions. However, although most questions asked by police officers are minimal intrusions, this Court has repeatedly held that not every minimal intrusion is permissible. For example, in *State v. Affsprung*, an officer stopped a car for having a faulty license plate light. 2004-NMCA-038, ¶ 2, 135 N.M. 306, 87 P.3d 1088. The officer, who had observed no other indications of suspicious or illegal activity, asked for the identification of both the driver and the passenger. *Id.* The passenger had no identification, but orally gave his name, date of birth, and social security number. *Id.* The officer ran a wants and warrants check and discovered that there was an outstanding warrant for the passenger. *Id.* ¶ 3. The district court denied the passenger's motion to suppress based on the officer's request for his information. *Id.* ¶ 1. This Court reversed, holding that "[w]ith no suspicion, much less reasonable suspicion, regarding criminal activity on the part of [the passenger], and no

13

particularized concern about his safety, the officer had no legitimate basis on which to obtain the identifying information for the purpose of checking it out through a wants and warrants check." *Id.* ¶ 19. We also distinguished between drivers and passengers in traffic stops, observing that the passenger's "mere presence in a vehicle with a faulty license plate light adds nothing of significance that causes this even minimal intrusion to tip the balance in favor of public or officer safety over individual Fourth Amendment privacy." *Id.* ¶ 20.

Similarly, in *City of Albuquerque v. Haywood,* an officer stopped a vehicle that had no license plate only to discover as he approached the vehicle that it in fact displayed a temporary tag. 1998-NMCA-029, ¶ 3, 124 N.M. 661, 954 P.2d 93, *overruled by Leyva*, 2011-NMSC-009, ¶ 17 n.1. Immediately after obtaining the driver's license and registration, the officer asked whether the driver had any guns or knives in the car. *Id.* ¶ 5. Reasoning that the question was not reasonably related to "verifying or quelling [the officer's] suspicion that [the driver] was operating a motor vehicle without the proper vehicle registration," this Court concluded that the question exceeded the scope allowed under *Terry*. *Haywood,* 1998-NMCA-029, ¶¶ 15-16.

Our cases also suggest that suspicion that a driver or passenger has engaged in criminal activity on other occasions does not create a reasonable suspicion that the occupants are engaged in criminal activity at the time of the traffic stop. For example,

in *Olson*, an officer converted a traffic stop into a prostitution investigation when he noticed that the passenger was a person known to him as a prostitute. 2011-NMCA-056, ¶ 3. This Court held that the mere presence of a known prostitute as a passenger did not provide reasonable suspicion that the driver had hired or offered to hire the passenger to perform a sex act. *Id.* ¶ 17. Accordingly, the expansion of the traffic stop into a prostitution investigation violated Article II, Section 10. *Id.* ¶ 18. Similarly, in *State v. Jones*, we held that the fact that a person was dressed like a gang member could not, by itself, provide reasonable suspicion that the person was armed and dangerous. 114 N.M. 147, 151, 835 P.2d 863, 867 (Ct. App. 1992) ("We will not make the final leap of faith the state urges upon us, i.e., that the inference arising from gang membership and presence in a gang activity area is sufficient alone to support reasonable suspicion.").

    With these cases in mind, we turn to the officer's interactions with Defendant. As in *Affsprung*, this case began as a traffic investigation, and the officer obtained the identification of both the driver and Defendant, a passenger. However, unlike *Affsprung*, here there was reason to obtain Defendant's information because the vehicle was rented in his name. The officer then separately questioned the driver about her travel history. This too was a minimal intrusion. As we have discussed, the State's interest in enforcing traffic laws outweighs a driver's interest in not being

15

questioned about her travel plans when detained for traffic violations. *See Duran,* 2005-NMSC-034, ¶¶ 28-29.

The officer next returned Defendant's identification and asked him about his travel plans. Like the request for the passenger's identification in *Affsprung,* asking the passenger about his travel history was not calculated to confirm or dispel any suspicions the officer may have had based on the reason for the traffic stop. Instead, it was calculated to *create* suspicion to justify turning a traffic stop into a drug investigation. In fact, although we express no opinion on whether it was permissible, it would appear that the only reason for the officer to return the documents separately to Defendant, rather than simply giving them to Ms. Stephens, was to create an opportunity to separately ask Defendant the impermissible questions. *See generally* 4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.3(d), at 393-95 (4th ed. 2004) (discussing the use of separate questioning about travel plans by police as a method of creating reasonable suspicion). This is exactly the sort of fishing expedition that our case law forbids.

The State contends that under *Duran,* questioning a passenger about travel plans during a traffic stop is permissible because such questions are reasonably related to the scope of the initial stop. This reading of *Duran* is too broad. In *Duran,* our Supreme Court held that questioning a passenger about travel plans was reasonable

16

because the presence of "strange and suspicious tools," irregular paperwork, and a gasoline smell, although not enough to provide reasonable suspicion, permitted the Court to conclude that limited questions about travel plans were reasonably related to the initial investigation into the misplaced temporary tag. 2005-NMSC-034, ¶ 37. Here, however, at the time when the officer asked Defendant about his travel history he was aware of no information that could have provided reasonable suspicion that Defendant was involved in criminal activity. Furthermore, the officer had already satisfied himself that Defendant was the renter of the car, that there had been no traffic infraction, and that there were no warrants for either occupant. The questions were not calculated to confirm or dispel Officer Johnston's suspicions because the officer had already concluded that Defendant was not engaged in any criminal activity.

The State also argues that the questions in this case were permissible under *State v. Van Dang*, 2005-NMSC-033, 138 N.M. 408, 120 P.3d 830. In *Van Dang*, an officer stopped a car for speeding and the driver provided his identification and a vehicle rental contract. *Id.* ¶ 1. Neither the driver nor the passenger was listed on the rental contract as a driver. *See id.* ¶ 2. The officer received different answers when he questioned the driver and the passenger about their travel plans. *Id.* ¶ 16. The officer was concerned that the car was stolen, and also testified that in his experience, it was common for rental cars to be used to transport drugs, frequently when the renter

17

was not present. *Id.* The Court found that this was sufficient to support reasonable suspicion. *Id.*

We do not agree that *Van Dang* is on point. Unlike *Van Dang*, there was no testimony in this case that the officer's training or experience would lead him to believe that the use of a rental car in this case suggested that drugs might be involved. Furthermore, and again unlike *Van Dang*, the renter was in the vehicle, and there was no question about whether Ms. Stephens was a permissive user of the car or about whether the car had been stolen. The circumstances that justified the questioning in *Van Dang* simply are not present in this case.

Once the officer had dispelled any suspicions regarding Defendant's right to use the rental vehicle, the case again became a simple traffic stop. As in *Affsprung*, questions to Defendant, who was a passenger, were not reasonably related to the original traffic investigation. The instant case is also similar to *Haywood*, where questions about weapons were not reasonably related to a traffic stop and where the officer had no information upon which to base a suspicion that the passenger might be armed and dangerous.

Furthermore, Officer Johnston could not rely on his impression that Ms. Stephens looked like a drug user to create reasonable suspicion to question Defendant. Officer Johnston did not suspect Ms. Stephens was under the influence of drugs. The

fact that he suspected that she used drugs at other times, combined with her extreme nervousness, may have given him reason to question her about her travel plans. However, as in *Affsprung*, Defendant's presence in a car with Ms. Stephens did not give rise to reasonable suspicion that Defendant might also be involved in a crime. *See* 2004-NMCA-038, ¶ 20; *see also Olson*, 2011-NMCA-056, ¶ 17 (holding that the presence of a passenger who was a known prostitute in the vehicle did not create reasonable suspicion that the driver had solicited her to perform a sex act). Even assuming the driver's appearance provided reasonable suspicion to question the driver about her travel plans, on the facts before us that reasonable suspicion did not automatically extend to the passenger. To the extent that the district court found that Defendant looked like he might be under the influence of drugs, we need only note that the officer testified that he observed these facts after he had returned Defendant's identification.

Finally, we must address *Leyva*'s assertion that "[t]he overall reasonableness of the stop continues to be 'determined by balancing the public interest in the enforcement of traffic laws against an individual's right to liberty, privacy, and freedom from arbitrary police interference.'" *Leyva*, 2011-NMSC-009, ¶ 55. On one hand, this balancing test is at odds with the rest of the opinion and does not appear to be used in other cases (indeed, it was not used in *Leyva*). On the other hand, the

*Duran* Court made passing reference to a balancing of interests in its analysis. *See Duran*, 2005-NMSC-034, ¶ 37. Our case law does not inform us how or when this balancing test should be considered. However, we need not consider this issue today. At the point when Officer Johnston questioned Defendant about his travel plans in this case, the State had determined that no traffic laws had been violated, at least by Defendant, who was a passenger. The State therefore had no remaining interest in traffic enforcement to balance against the minimal intrusion of the additional questioning.

Our Supreme Court has repeatedly stated that an officer need not ignore what he sees and hears, but must respond to the "emerging tableau" he is confronted with. Implicit in this, and in our requirement that questions be reasonably related to the initial stop or supported by reasonable suspicion, is that the "tableau" *must already have emerged*. In this case, as in *Affsprung*, *Haywood*, and *Olson*, the officer began questioning Defendant before the "emerging tableau" justified an expansion of the investigation. In doing so, he violated Defendant's rights under Article II, Section 10 of the New Mexico Constitution.

**III.  CONCLUSION**

For the foregoing reasons, we reverse the order denying the motion to suppress and remand for further proceedings consistent with this Opinion.

**IT IS SO ORDERED.**


_____
MICHAEL D. BUSTAMANTE, Judge

WE CONCUR:


_____
MICHAEL E. VIGIL, Judge


_____
LINDA M. VANZI, Judge